# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**NORDOCK INC.,**

                    **Plaintiff-Counterclaim-Defendant,**

**v.**

                                        **Case No. 11-C-118**

**SYSTEMS INC.,**

                    **Defendant-Counterclaimant.**

---

# DECISION AND ORDER

---

The Plaintiff and Counterclaim-Defendant, Nordock Inc., ("Nordock"), and the Defendant-Counterclaimant, Systems Inc. ("Systems"), are rivals in the loading dock device industry. Both companies design, manufacture, and sell dock levelers which are mechanical devices used to create a bridge between loading dock surfaces and the surfaces of truck load beds. Both companies are currently manufacturing dock levelers that use a lip, lug and hinge plate design to bridge the gap between the loading dock and a truck load bed.

Nordock alleges that several models of Systems' dock levelers are infringing on its design patent, United States Design Patent Number D 579,754 (the "'754 patent"), for a lip, lug, and hinge plate in violation of 35 U.S.C. §271 (Count I), engaging in federal unfair competition in violation of 15 U.S.C. §1125 (Count II), common law unfair competition (Count III), and unfair methods of competition or unfair deceptive acts or practices under

Wisconsin Statutes §§ 100.18 and 100.20 (Count IV). Systems' counterclaim seeks declaratory judgment of non-infringement and invalidity of the '754 patent.

This Decision and Order addresses the following five motions: Nordock's motions to strike Adam Brookman ("Brookman") as an expert witness regarding trade dress and unfair competition and to strike Brookman as an expert as to the validity, claim construction and infringement of the '754 patent; and for partial summary judgment with respect to the '754 patent; and Systems' motions for summary judgment dismissing all the claims of Nordock's Complaint, and for an order to pay expert fees. The Court begins by addressing the motion regarding payment of expert fees.

## SYSTEMS' MOTION FOR AN ORDER TO PAY EXPERT FEES

Systems requests an order directing Nordock to pay expert fees (ECF No. 113), relying on the Court's November 21, 2012, Decision and Order (ECF No. 97) requiring Nordock to pay the reasonable fees of experts Brookman and Richard F. Bero ("Bero"), pursuant to Federal Rule of Civil Procedure 26(b)(4)(E). The filing of the motion prompted Nordock's payment of Brookman's fees. Thus, that aspect of Systems' motion has been rendered moot.

Nordock has sent Bero a check for $4,000.00. However, it asserts that Bero's invoice for $17,007.00 is unreasonable because little, if any, of his time spent preparing for the deposition is recoverable under Rule 26; the fees requested by Bero are not recoverable

2

because compliance with document requests was required under Rule 26(a)(2)(B); and Bero's invoice fails to provide sufficient detail to determine whether the time billed was reasonable.

As Judge Milton Shadur observed, "[t]here are mixed judicial rulings" on the recoverability of an expert's preparation time. *Waters v. City of Chicago*, 526 F.Supp. 2d 899, 900 (N.D. Ill. 2007); *see also,* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2034 (3d ed. 2010). However, *Halasa v. ITT Educ. Servs., Inc.,* 690 F.3d 844, 852 (7th Cir. 2012), upheld an award under Rule 26(b)(4)(E)(i) that included preparation time. *See also Chambers v. Ingram,* 858 F.2d 351, 360-61 (7th Cir. 1988). Therefore, the Court will allow preparation time.

The next question is whether the claimed amount is "reasonable." Fed. R. Civ. P. 26(b)(4)(C). The legal authority determining the reasonableness of expert fees is sparse. See 8A Wright, Miller, & Marcus, *supra*, § 2034. Courts that have applied the principle frequently have focused on the "ratio of preparation time to deposition time." *Collins v. Village of Woodridge*, 197 F.R.D. 354, 358 (N.D. Ill. 1999). In some circumstances — for example, a short deposition of a minor fact witness — "the 'reasonable' compensation for deposition preparation time [may] be zero or a nominal amount." *Id.* Judges in this circuit have approved compensation at a 1.5:1 or even a 3:1 ratio. *See Nilssen v. Osram Sylvania, Inc.*, No. 01 C 3585, 2007 WL 257711, at *5 (N.D. Ill. Jan. 23, 2007) (approving 3:1 ratio "based on the extensive document review required, the complexity of the issues, and the breadth of the expert's report); *See Collins*, 197 F.R.D. at 358 (rejecting a 3:1 ratio, but

3

approving a 1.5:1 ratio in view of, inter alia, the "unusually extensive" amount of material that the experts reviewed in preparation for deposition).

The 38-page Bero report, with an additional 66 pages of tables, is highly detailed and contains alternative calculations for patent infringement damages. The report indicates that he reviewed extensive materials in preparing the report. (*See* Bero Report, 1 & Attach. 1 (5 pages)). (ECF No. 37-1 (SEALED).) Given the complexity of Bero's report, the Court approves a 3:1 ratio for preparation time. Thus, for Bero's three-hour deposition, he may claim nine hours of preparation time.

With respect to the amount of the fee, in general, courts determine the reasonableness of an expert's fee by considering the following factors:

> (1) the expert's area of expertise; (2) the education and training required to provide the expert insight that is sought; (3) the prevailing rates of other comparably respected available experts; (4) the nature, quality, and complexity of the discovery responses provided; (5) the fee actually being charged to the party that retained the expert; (6) fees traditionally charged by the expert on related matters; and (7) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26.

*Se-Kure Controls, Inc. v. Vanguard Prods. Group, Inc.*, 873 F. Supp. 2d 939, 955 (N.D. Ill. 2012) (collecting cases).

Neither party addressed these factors. However, the Bero report includes the following information: Bero is certified public accountant accredited in business valuation, a certified valuation analyst, and Managing Director of The BERO Group. Bero received a Bachelor of Business Administration from the University of Wisconsin-Madison in 1986. He

4

has analyzed economic damages and accounting and financial issues in a variety of litigation matters concerning patent infringement, trademark infringement, copyright infringement, trade secrets, breach of contract, dealership disputes and construction disputes. Bero's hourly rate is $475.00, the rate at which he has billed Systems for his services. Based on the foregoing, the Court approves Bero's $475.00 rate for 12 hours which equals $5,700.00

Thus, Systems' motion is granted to the extent that Nordock must pay an additional $1,700.00 to Bero by the stated deadline. Next, the Court addresses the two motions to strike Brookman as an expert witness.

## BROOKMAN AS AN EXPERT WITNESS — TRADE DRESS AND UNFAIR COMPETITION

Nordock seeks an order barring Systems from calling Brookman as an expert witness on trade dress and unfair competition and excluding his report (ECF No. 54-3) for failure to disclose it by the June 20, 2012, deadline set by the scheduling order, and imposing sanctions pursuant to Rule 37(c) of the Federal Rules of Civil Procedure. (ECF No. 52.) Systems responds that Brookman's trade dress and unfair competition report was timely disclosed as a rebuttal report because Systems does not bear the burden of proof on the trade dress issues.

Federal Rule of Civil Procedure 26 requires an expert witness to give "a complete statement of all opinions the witness will express and the basis and reasons for them" in the expert's initial report. Fed. R. Civ. P. 26(a)(2)(B)(i). The Rule also permits experts to submit rebuttal reports, but limits the contents of those reports to "evidence [that] is intended

5

solely to contradict or rebut evidence on the same subject matter identified" in another party's expert witness report. Fed. R. Civ. P. 26(a)(2)(D)(ii). Stated somewhat differently: A party presents its arguments as to the issues for which it has the burden of proof in its initial expert report. A rebuttal expert report presents expert opinions refuting the arguments made by the opposing party in its initial expert report.

The parties' combined joint status report and discovery plan states "The parties agree that initial [e]xpert reports *on matters for which the parties bear the burden of proof* will be served by June 20, 2012, that rebuttal expert reports shall be served by July 20, 2012, and that expert discovery shall be completed by August 20, 2012." (emphasis added.) (ECF No. 12.) That agreement will be enforced.

In this action, as the proponent of the trade dress and unfair competition claim, Nordock bears the burden of establishing the elements of that claim. *See Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir. 1998). Nordock's technical expert, Steven Carl Visser ("Visser") opined about the functional versus ornamental dichotomy which is also an element of Nordock's unfair competition claim. (*See* Visser Report, 80.) (Dkt 26-1, 81.) While the two standards are not identical, they overlap. (See Ex. 1, Nordock's Reply Re: Mot. Strike Brookman Trade Dress and Unfair Competition (Adam L. Brookman, *Trademark Law: Protection, Enforcement and Licensing*, (Wolters Kluwer Law and Business, 2012 Supp.), 6-61.) (ECF No. 78-1.) Therefore, to the extent that Visser expressed opinions about matters that overlap between both design patent claims and unfair competition claims, Brookman's

6

report (ECF 54-3) is a rebuttal.  Brookman's entire report regarding trade dress will not be excluded as being untimely, and no sanctions are warranted.

In its reply brief, Nordock maintains that pages one through twelve of Brookman's trade dress and unfair competition report are outside the scope of Visser's report and should be struck.  (ECF No. 78.)  Having reviewed both reports, the Court concludes that the following portions of Brookman's report are not rebuttal: sections 1 (secondary meaning) and 1.a. (long use of the mark) on pages seven and eight; 1.b. (advertising) on pages eight and nine, and the final sentence of the section on page 12; and 1.c. (consumer recognition) on page 12.  Therefore, the Court excludes those portions of the Brookman trade dress and unfair competition report and any related testimony on those subjects by Brookman.  The remaining portions of the trade dress report are background regarding Brookman; a summary of the applicable law; and an analysis of function/functionality in the context of the claims in this case.  Those portions of the report and any testimony on those subjects are permissible rebuttal.

Nordock further challenges the trade dress report contending it is legal opinion which does not qualify as expert opinion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993).  Systems contends that Brookman's report meets the standards for admissibility of expert testimony.

Based on its ruling with regarding the proper scope of Brookman's rebuttal trade dress report, the Court limits its analysis to Nordock's *Daubert* challenges with respect to

7

functionality.  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  *Daubert*, 509 U.S. at 588.  Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Regional circuit law governs the decision whether to admit expert testimony in a patent case. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

The Court of Appeals for this Circuit has outlined a three-step analysis for determining whether the expert testimony is both relevant and reliable: "[T]he witness must be qualified 'as an expert by knowledge, skill, experience, training, or education,' Fed. R. Evid. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93, . . . ; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702." *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007); *Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1360 (Fed. Cir. 2008).

8

In determining reliability, courts are to consider the following non-exhaustive list of guideposts: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin*, 492 F.3d at 904 (citing *Daubert*, 509 U.S. at 593-94). "The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard*,"* by the preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The weight and credibility of an expert's testimony may be challenged through "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

With respect to Brookman's trade dress and unfair competition report, Nordock contends Brookman does not have sufficient knowledge or relevant experience in designing or manufacturing products or machines to be an expert in this case.

Brookman obtained a Bachelor of Science Degree in Industrial Engineering from the Georgia Institute of Technology in 1983, which involved course work in mechanical, electrical and civil engineering. For two years, before attending law school, Brookman worked as a project engineer and manager for the Frito Lay Company.

In 1987, Brookman obtained a law degree from George Washington University, and, for more than 25 years he has practiced intellectual property law. Brookman was previously qualified as an expert witness and consultant with respect to trademark, trade dress,

9

and design patent issues in intellectual property cases. He taught trademark law as an adjunct professor of law at Marquette University, frequently speaks on intellectual property subjects, and wrote *Trademark Law: Protection, Enforcement and Licensing*, published by Wolters Kluwer Law & Business.

With respect to the particulars of this case and dock levelers in general, Brookman's report (ECF No. 67), discloses that Systems contacted him in April 2012, and he has prepared himself by obtaining the complete file history of the '754 patent and all related patents and applications, and copies of the pleadings in this case, including exhibits associated with them. He also reviewed Nordock's website, the websites of third-party dock leveler providers, and numerous third-party design and utility patents relating to dock levelers and lug type hinges, reviewed the transcript of Gerald Palmersheim's deposition, and spoke to him about the design in issue and the construction of dock levelers generally.

Based on the foregoing, Brookman has sufficient knowledge, experience, and education to qualify as expert witness on function and functionality. The remaining concerns expressed by Nordock are disagreements with the correctness of Brookman's opinions, not with their reliability. Nordock may explore any weaknesses in Brookman's reports through cross-examination and other means available to Nordock. Therefore, Nordock's motion to strike Brookman as an expert witness regarding trade dress and unfair competition is granted as to those portions of his report that are not rebuttal and any related testimony by him and denied in all other respects.

## BROOKMAN AS AN EXPERT WITNESS — PATENT VALIDITY, CLAIM CONSTRUCTION AND INFRINGEMENT

Nordock also seeks an order striking Brookman as an expert witness for Systems on the issue of patent validity, claim construction, and infringement. (ECF No. 111.) Nordock contends that Brookman has no special knowledge or experience as to product design or dock levelers, and asserts that the relevant art is that of design, citing *In re Nalbandian*, 661 F.2d 214, 1216 (C.C.P.A. 1981). System contends that Brookman's report on those issues meets the standards for admissibility of expert testimony.

Despite the title of Nordock's motion, Brookman's report addresses the issue of whether the '754 patent is functional. He does not express opinions on infringement or claim construction. Additionally, his report satisfies the second prong of the test. Again, the concerns raised by Nordock, mainly disagreements with Brookman's opinions, may be addressed by cross-examination and competing testimony. Nordock's motion to strike Brookman as a witness regarding validity, claim construction, and infringement is denied.

## CLAIM CONSTRUCTION

At Systems' request, the Court conducted a claim construction hearing on January 30, 2013. Having considered the testimony and evidence presented at that hearing,[1] the briefs of the parties, and the applicable law, the Court issues the following claim construction decision.

---

[1] Over Nordock's objection, Brookman provided testimony at the claim construction hearing. The testimony was quite similar to Brookman's report and has been considered by the Court to the extent it was helpful.

This Court has "a duty to conduct claim construction in design patent cases." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008). The Court of Appeals for the Federal Circuit has stated "[g]iven the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for [the Court] not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Id.* Design patents are limited to what is depicted in the drawings and, therefore, have almost no scope. *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988).

The court added that a trial court may find it helpful to point out, either for a jury or in the case of a bench trial by way of describing the court's own analysis, various features of the claimed design as they relate to the accused design and the prior art. *Egyptian Goddess,* 543 F.3d at 680. Other issues bear on the scope of claim construction such as: describing the role of particular conventions in design patent drafting, including the role of broken lines, *id.*, (citing 37 C.F.R. § 1.152); assessing and describing the effect of any representations that may have been made in the course of the prosecution history, *id.* (citing *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998), overruled on other grounds by *Egyptian Goddess, Inc.,* 543 F.3d at 678); and distinguishing between those features of the claimed design that are ornamental and those that are purely functional, *id.* (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997) ("Where a design contains both functional and non-functional elements, the scope of the claim must be

12

construed in order to identify the non-functional aspects of the design as shown in the patent.").

<h2 align="center">Construction of Claim</h2>

Nordock urges the Court to adopt the following construction of the claim of the '754 patent: "The ornamental design of a lip and hinge plate for a dock leveler, as shown and described."  The proposed construction is taken verbatim from the patent's sole claim. Systems does not offer a claim construction of its own; instead, Systems' claim construction argument is that, with the exception of small notches on the upper edge of the hinge or header plate, all the elements of the '754 patent are functional and, therefore, the '754 patent is primarily functional.  Systems also asserts that prosecution history estoppel bars the ornamentation claim.

Having reviewed the patent which is the primary source of claim construction and considering *Egyptian Goddess*, the Court adopts the following claim construction for the single claim of the '754 patent:  "The ornamental design of a lip and hinge plate for a dock leveler, as shown and described."  The construction includes the seven figures (drawings) of the '754 patent as set forth in the appendix to this Decision and Order, and the following description of those figures in the '754 patent specification:

> FIG. 1 is a perspective view showing the lip and hinge plate for a dock leveler with the lip extended, and the hinge plate secured to a deck frame shown in broken lines.

13

FIG. 2 is a front view of the lip and hinge plate for a dock leveler, and showing the deck frame, drive brackets and drive bar opening in broken lines.

FIG. 3 is a rear view of the lip and hinge plate for a dock leveler, and showing the deck frame, drive brackets and drive bar opening in broken lines.

FIG. 4 is a top view of the lip and hinge plate for a dock leveler, and showing the deck frame in broken lines;

FIG. 5 is a bottom view of the lip and hinge plate for a dock leveler, and showing the deck frame and drive brackets in broken lines.

FIG. 6 is a side view of the lip and hinge plate for a dock leveler showing the lip in its extended position, and the deck frame in broken lines; and,

FIG. 7 is a side view of the lip and hinge plate for a dock leveler showing the lip in its pendant or lowered position, and the deck frame in broken lines.

The side view opposite FIG. 6 is a mirror image. The deck and deck frame shown in broken lines in FIGS. 1 and 3–7, the drive brackets shown in FIGS. 1–5, the drive bar opening shown in FIGS. 1–3, and the assist spring mounting bracket shown in FIG. 1 represent environmental structure in order to show the claim in a condition of use and form no part of the claimed design.

### Other Claim Construction Issues

The Court now addresses other issues bearing on claim construction. *Egyptian Goddess,* 543 F.3d at 680. As stated in the patent specification, the broken lines in the figures do not form any part of the claim.

14

In addition, as clarified at the claim construction hearing, the ornamental design of the lip and hinge plate as shown and described includes nine pairs of tear-drop shaped lugs, attached to the header plate and lip to form the hinge, and the pin that is threaded between the lug pairs. The shape of the lug attached to the header plate is not identical to that attached to the lip, and is elongated as shown in Figures 6 and 7 to close the gap between it and the deck.

### *Prosecution History*

Next the Court considers the prosecution history, *see id.,* of the '754 patent issued from originally-filed utility patent application number 10/328,279 (the "'279 application") filed on December 23, 2002, which is now U. S. Pat. No. 6,834,409 (the "'409 patent"). Nordock applied for utility patent protection for its lug hinge design in divisional application number 11/179,941 (the "'941 application") filed on July 12, 2005. The '941 application was rejected over the prior art, and Nordock abandoned prosecution of that utility patent. Figures 10A through 10G were a part of the '941 application. Those seven figures are included in the '754 patent. Figure 10A is figure 1 in the '754 patent, figure 10B and 10C are figures 2 and 3 in the '754 patent, figures 10D and 10E are figures 4 and 5 of the '754 patent, and figures 10F and 10G are figures 6 and 7 of the '754 patent.

Based on this history, Systems asserts that by abandoning the '941 application, Nordock forever abandoned the lug hinge header plate design to the public, citing *Johnson & Johnston Associates, Inc. v. R.E. Service Co., Inc.,* 285 F.3d 1046 (Fed. Cir. 2002). However, *Johnson & Johnston* was addressing the doctrine of equivalents, holding that "when a patent

15

drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public [and] [a]pplication of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would 'conflict with the primacy of the claims in defining the scope of the patentee's exclusive right.'" 285 F.3d at 1054. The Court is not addressing the issue of infringement under the doctrine of equivalents; it is addressing proper legal construction of the claim language. Systems has not cited any authority indicating that *Johnson & Johnston* applies to preclude a design patent when an earlier utility patent has been abandoned. Systems' prosecution history argument is not persuasive on the claim construction issue.

### *Functional vs. Non-Functional Components*

The Court must also identify functional and non-functional elements. The design incorporates four primarily utilitarian elements: the lugs, the pin, the header plate, and the lip. The relative positions of the header plate and the lip which are at the front portion of the dock leveler are dictated by the function of a dock leveler; that is, to create a bridge between the truck and the loading dock.

The lugs and the pin form a hinge which is essential to the function of the dock leveler. All the dock levelers shown to the Court during the claim construction hearing had a mechanism which allowed the lip to be stored when not used and to extend when in use to form the bridge. The location of the hinge at the juncture of the lip and header plate is

16

functional.  These conclusions are consistent with and supported by paragraphs 19 and 20 of the initial report of Nordock's expert, Visser.  (ECF No. 26-1.)

However, there are ornamental aspects of the design.  While the header plate is used to tie the supporting beams and create a box type of structure, (*see* Brookman report at 16) (ECF No. 67), there are alternatives.  There are dock levelers that do not have header plates, and there are dock levelers with partially open fronts, and other styles.  The header plate, its shape and proportions relative to the lip are not dictated by its function.

There are also a variety of hinge types including piano hinges which have no lugs and wrap-around hinges.  In instances where lugs are used there are many shapes of lugs, and lugs with gussets and partial gussets.  The shape, spacing, pairing and the difference in shapes between the lugs attached to the header plate and the lip are also ornamental features of the '754 patent.  Having completed its construction of the design patent, the summary judgment and partial summary judgment motions are addressed.

## SUMMARY JUDGMENT MOTIONS

Overlapping issues are presented by Nordock's partial summary judgment motion that the design has sufficient ornamentation; the design is not barred by the claims of related utility patent applications; the design is valid under 35 U.S.C. §§102, 103 and 112; and enforcement is not barred by reason of laches, estoppel or unclean hands, (ECF No. 59), and Systems' motion for summary judgment dismissing all of Nordock's claims (ECF No. 65). Therefore, the two motions will be addressed together.

17

Nordock presented 62 proposed findings of fact[2] in support of its partial summary judgment motion, proposed material facts 65 to 145 in opposition to Systems' summary judgment motion, and a statement of proposed material facts 146 through 152. (ECF Nos. 61-3, 81-11, 90-8). Systems did not file a response to any of Nordock's 150 proposed findings of fact. Systems presented nine proposed findings of fact, to which Nordock responded. (ECF Nos. 65 & 81-11.)

Civil Local Rule 56(b)(4) (E.D. Wis.) provides that "the Court will deem uncontroverted statements of material fact admitted solely for the purposes of deciding summary judgment." Nordock's proposed finding of material facts are deemed admitted. Arguments and legal conclusions[3] are not facts and have not been included in the relevant facts. Paragraph 35 of Nordock's proposed findings of fact discloses a genuine dispute and therefore has not been included.

Civil Local Rule 56(b)(6) relates to citations of fact in legal memoranda and requires that assertions of fact in a party's memorandum must refer to the corresponding numbered paragraph of the statement of facts, statement of additional facts, or statement of stipulated facts. To the extent a party has not complied with the rule, those facts are not properly presented and have not been considered.

---

[2]Nordock's proposed findings of fact end with paragraph number 64; however, no paragraph 31 or 32 is included. Therefore, Nordock has a total of 150 proposed findings of fact despite the numbering.

[3]Examples are paragraphs 52 and 53 of Nordock's proposed findings of fact.

18

## Standard for Summary Judgment

"Summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir. 1984). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *See Anderson*, 477 U.S. at 255. "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See id.* at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of a trial — (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law — is upon the movant. *See* Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A party opposing a properly supported summary judgment motion may not rest upon mere

19

allegations or denials of his pleading, but must set forth specific facts showing that there is an issue for trial. *Anderson*, 477 U.S. at 248.

"In rendering a decision on a motion for summary judgment, a court must 'view the evidence presented through the prism of the substantive evidentiary burden' that would inhere at trial." *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 880 (Fed.Cir. 1998) (quoting *Anderson*, 477 U.S. at 254). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted).

*Statement of Relevant Facts*

A variety of manufacturers sell a variety of dock levelers in the United States. A non-exhaustive list of manufacturers is as follows: Rite-Hite, 4Front, Systems, Blue Giant, Pentalift, Pioneer and Nordock. About 80 percent of the dock levelers sold in the United States are manufactured by Rite-Hite, 4Front and Systems. 4Front includes the Kelley and Serco brands. Systems includes the PoweRamp, DLM and McGuire brands. The remaining 20 percent of dock levelers sold in the United States are made by the other companies. Dock levelers are designed to meet various rated capacities. Each specific leveler achieves a specific rated capacity. Dock levelers are purchased by end users and distributors who resell them to end users.

20

Dock levelers sold in the United States come with a variety of front end styles or appearances. The front end of a dock leveler includes an extendible lip secured to the deck of the leveler.

Examples of some front end styles are as follows:

**Open Front (Deck Lug, No Header Plate)**

- Deck lugs are attached to deck beam.
- Deck lugs are an extension of (integral with) deck beam.

**Partially Open Front**

- Contoured gusseted piano hinge style (J-shaped hinge segments).
- Piano Hinge (Short header bar does not cover deck beams).
- Closed Front (Piano Hinge and Header Plate)
- Piano Hinge (Standard - No Gussets)
- Piano Hinge with Gussets (header and lip)
- Piano Hinge with Gussets ( header only)
- Piano Hinge with Gussets on (lip only)
- Cantilevered piano hinge with projecting hinge supports.

**Closed Front (Contoured Non-Full Width Header Plate)**
- Multi Hinge Set design with Non-continuous pivot rod.

**Closed Front (No Header Plate)**

- Contoured gusseted piano hinge style (continuous-shaped hinge).

**Closed Front (Deck Lugs and Header Plate)**

- Deck lugs extend from header plate with mating lip lugs.

Each of the components forming the front end of a dock leveler can come in a variety of sizes, shapes and arrangements. For example, when lugs are used, their size, shape and spacing can vary: the deck lugs can be shaped differently than the lip lugs; the "deck

21

lug-to-lip lug" ratio can be one-to-one, two-to-one, or a combination; and the lugs can be aligned with the deck beams or independent of the deck beams. When a header plate is used, the header height can be longer than, the same as, or shorter than the deck beams; the shape of the header can be contoured; the width of the header can be shorter than the full width of the deck. The lip can be short or long, tapered at its free end, or flat or bent about midway along its length. The pivot rod can be continuous or divided into segments.

Denis Gleason ("Gleason"), the sole inventor of the '754 patent, conceived of the design shown in the '754 patent no earlier than November of 2001. Gleason designed Nordock's front end "header plate and lug style" hinge design to incorporate a recognizable appearance that would distinguish Nordock and its levelers from those of other manufacturers. The appearance Gleason chose for the front end lip, lug and header plate design was to suggest the rugged durability of the Nordock levelers. Gleason did not choose Nordock's front end "header plate and lug style" hinge design out of necessity or because they were the most cost efficient way to make the front end of a dock leveler. Prior to December 2001, Nordock was not aware of a dock leveler sold in the United States with a header plate and deck lugs to secure the lip to the front of the deck.

Gleason founded Nordock in December 2001. Gleason, Nordock's President and CEO, has spent his entire career in the dock leveler industry. Before starting Nordock, Gleason was employed by Kelley-Atlantic. Shawn Ward ("Ward") worked for Kelley-Atlantic and has worked for Nordock in a marketing/sales capacity since Nordock's inception. Nordock

22

began selling dock levelers with its front end design in the United States in 2002. Also in 2002, Gleason and Ward conducted a coast-to-cost marketing campaign to personally meet with and promote Nordock's levelers to potential distributors. Nordock's Dual Duty and Industrial levelers are made and sold with rated capacities of between 25,000 and 50,000 pounds in 5,000 pound increments.

Gleason and Ward believe that dock leveler consumers consider the appearance of the leveler when making purchasing decisions.

The cover pages of Nordock's brochures include large pictures of their levelers with the front-end facing forward. Although brochures sometimes include text regarding the attractive appearance of the leveler (Ex. J) (ECF No. 63-11), brochures typically avoid text discussing appearance. Visser believes that in the industrial market it would be "counterproductive for a manufacturer to describe how aesthetically pleasing its design is, and it might be interpreted as superficial or egotistical." (Ex. K (Visser Rebuttal), 11.) (ECF No. 63-12.) Nordock's brochures avoid discussing appearance because do so can be perceived as detracting from the engineered quality, strength and safety.

Trade shows display dock levelers with the deck elevated and the lip extended. The front end of the leveler is about eye level to the viewer, and the front end of the leveler is the first part of the leveler the consumer sees. No orders for dock levelers are taken at trade shows.

23

The '754 patent issued from the originally-filed '279 application filed on December 23, 2002, which is now the '409 patent. Three concepts set forth in Nordock's '279 application (Ex. Q) (ECF No. 64-3), are summarized as follows:

> a. The structure of dock leveler with deck assembly, lift assembly and hold down mechanism with a lift member, wherein the deck assembly releases for the lift member when the load is removed from the trailer bed. (Claims 1-19);

> b. The structure of dock leveler with deck assembly movable through a range of inclined positions, a lip assembly movable between pendent and extended positions, a lift assembly having a series of linked components and movable between engaged and disengaged positions, where one of linked component releases from pushing engagement with an other linked components when in the disengaged position. (Claims 20-35); and

> c. The structure of dock leveler with deck assembly, header plate, header lugs, lip plate, lip lugs and continuous rod with the lip hingably movable between pendent and extended positions. (Claims 36-41).

The '297 application includes 21 figures. Figures 10-A through 10-G show a perspective view and front, rear, top, bottom and side views of the lip and hinge plate. (Ex. Q NOR 00123).

On February 25, 2003, Gleason's assignment of the '279 application to Nordock was publically recorded with the United States Patent and Trademark Office ("PTO"). The assignment includes the right to any division or continuation of the '279 application.

Nordock initially elected to pursue claims 1 through 20 of the '279 application. The '279 application issued as the '409 Patent on December 28, 2004.

24

Prior to the issuance of the '409 Patent, Nordock filed United States Divisional Application No. 10/998,532 (the "'532 application"). The '532 application is the same as the '279 application. Nordock withdrew previously allowed claims 1 through 19, and pursued claims 21 through 35. The '532 application issued as United States Patent No. 7,013,519 (the "'519 patent") on March 21, 2006.

On July 12, 2005, prior to the issuance of the '519 patent, Nordock applied for utility patent protection for its dock leveler in the ''941 application, a divisional application. The '941 application is the same as the '279 and '532 applications. Nordock withdrew previously allowed claims 1 through 19 and 20 through 35, and pursued claims 36 through 41.

On March 23, 2007, the PTO issued an Office Action rejecting claims 36 through 41 as unpatentable under 35 U.S.C. § 103(a) because they were obvious given United States Patent No. 6,370,719 to Alexander (the "'719 patent" or the "Alexander patent"). In part, the Office Action determined that the '719 Patent disclosed a leveler having a deck assembly (30) supported by beams (32), a header plate (74) with lugs (75) and a lip plate (56) with lugs. (Ex. S, 2.) (ECF No. 64-5.) Nordock did not respond and allowed the '941 application to lapse on June 23, 2007.

On May 31, 2007, Nordock filed United States Continuation Application No.29/288,137 (the "'137 application.") (Ex. U.) (ECF No. 64-7.) The '137 application includes Figures 10A through 10G of the '279, '532 and '941 applications.

25

The PTO and Examiner were aware of the specifications and claims 36 through 41 in Nordock's original and divisional applications. The first sentence of the '754 application lists the application and patent numbers for the original and divisional applications. Fifty three prior art references are listed on the cover page and second page of the '754 patent.

The PTO considers inventorship, lack of ornamentation, utility application estoppel, anticipation and obviousness (§102 and §103) and enablement (§112) during its review of a design application. On November 4, 2008, the PTO issued the '754 patent.

### Advertising

Nordock's Industrial leveler brochure includes the following bullet point phrase. "Exclusive Self Cleaning Lip Lug and Header Plate Design." (Ex. P.) (ECF No. 64-2.) Nordock's lip lug and header plate design is not the only dock leveler design to offer self cleaning hinges. (Ex. C1, Kelley brochure Bates No. NOR 01611; Ex. K (Visser Rebuttal), 27-28.) Nordock's marketing statement is intended to emphasize the exclusivity of its design, not that its design is the only way to achieve a self cleaning hinge.

Nordock's Dual Duty leveler brochure includes the following bullet point phrase. "Exclusive Lip Lug and Header Plate Design Ensures Maximum Strength" (Ex. P.) Nordock's lip lug and header plate design is not the only dock leveler design to assert its strength, or that its strength achieves its stated rated capacity. Nordock's marketing statement is intended to emphasize the exclusivity of its design, not that this design is the only way to achieve maximum strength. Like others in the dock leveler industry, Nordock marketing

26

literature includes advertising stating its levelers are strong. However, not everyone in the industry has the strongest leveler.

## Systems' Development of Accused Levelers

Systems has made and sold dock levelers since the 1960s. To the best of Systems' knowledge, for about 40 years, Systems only made and sold dock levelers with a "piano style" hinge. Edward McGuire ("McGuire"), Systems' current president and the son of Systems' founder, began working for Systems in 1986. McGuire could only be certain that Systems has only used piano hinge since 1986. Systems was aware of Nordock's '409 patent at least as early as the spring of 2005.

The '409 patent includes Figures 10A through 10G of Nordock's original '279 application (now the '754 patent). Systems' president, vice president, and outside patent counsel were aware of Nordock's header plate and lug style design in shown Figures 10A through 10G during Systems' development of its accused levelers.

McGuire agrees there are a variety of ways for making the front end of a dock leveler. He developed the accused levelers without the use of his engineering department. McGuire said that Systems adopted the front end design of its accused levelers for cost reasons specific to Systems. Systems' levelers already had a deck with a "box" construction, and it wanted to avoid time delay and analysis costs that it would incur if it chose to develop an open front lug style leveler.

27

In October 2005, Systems began selling its accused levelers. McGuire denies that Systems was aware of Nordock's front end header plate and lug style hinge design when it decided to make its accused levelers with a header plate and lug style hinge design.

Systems asserts "its" header plate and lug style hinge design is based on a Combursa brochure, SI00604. Systems' current employee, Mark Lobel ("Lobel"), brought the brochure back from his November 2003 trip to China. Lobel was not a Systems employee until after his trip to China. He kept the Combursa brochure at his residence for a number of years. Although the Combursa brochure is in a foreign language, Systems has not produced a translation of the brochure.

### Nordock's Pre-Litigation Correspondence with Systems

On May 19, 2009, Nordock advised Systems of its '754 Patent, and that Systems' subject leveler infringed the '754 patent. On July 13, 2009, Systems' counsel responded by asserting that the '754 patent is invalid. After this exchange of letters, Nordock continued to correspond with Systems until March 10, 2010. However, Systems did not respond.

Prior to the subject litigation, Systems obtained one or more legal opinions from its outside counsel regarding its accused levelers and the '754 patent or its related parent patents. To date, Systems has not altered the overall appearance of its accused levelers.[4]

---

[4]Paragraph 60 of Nordock's final submission regarding its proposed finding of facts filed on November 5, 2012, states that "Systems refuses to produce its pre-litigation, outside counsel legal opinion(s) regarding its accused levelers and the '754 Patent or its related patents." The proposed finding has been excluded: it is part argument and in part lacks factual support.

The docket indicates that on October 5, 2012, Systems was ordered to produce all such opinions. (ECF No.

### Nordock's Complaint

On January 28, 2011, Nordock filed its Complaint against Systems. Systems' Answer, Affirmative Defenses and Counterclaim filed May 11, 2011, assert that the front-end design covered by the '754 Patent has insufficient ornamentation; i.e., is functional; is barred by the claims of related utility patent application; is [not] valid under 35 U.S.C. §§102, 103 and 112; and enforcement is barred by reason of laches, estoppel or unclean hands.[5]

### Systems' Witness-Norbert Hahn

Norbert Hahn ("Hahn"), a fact witness for Systems, was born in Germany in 1946, received a mechanical engineering degree from Hamburg State College in the mid-1960's, and immigrated to this country in 1968. Hahn was an employee of Rite-Hite from 1973 until he retired in January 2012. Hahn was Rite-Hite's director of engineering from 1985 to 2011, and continues to work for Rite-Hite under a handshake contract. Rite-Hite's legal counsel advised Hahn that he should not testify as an expert in this case because Hahn is on retainer for Rite-Hite and testifies as an expert for it.[6]

_____

77.) In a November 21, 2012, Decision and Order, the Court recognized and relied upon Systems' representation that it had produced all opinions subject to that October 5, 2012, Order. (ECF No. 97.)

[5]Paragraphs 61 through 63 of Nordock's proposed findings of fact are argument regarding the identification of a primary reference by Systems as a basis for its defenses of obviousness or anticipation. Therefore, they are not included. Paragraph 64 is also argument regarding whether Brookman is a person of ordinary skill of the art, and has been excluded. Paragraph 65 is duplicative of paragraphs 45 through 50 and has not been included; it also is argumentative.

[6]Paragraph 70 of Nordock's proposed findings of fact states "Rite-Hite's legal counsel 'put it to' Hahn that he should not to testify as an expert in this case," citing pages 14 to 15 and 33 through 38 of the Hahn deposition. The full statement reads "It was put to me by our lawyer as a – – that it is not appreciated because I am on retainer for Rite-Hite." (Ex AL, 38;2-4.) The Court has rephrased the statement. to reflect the cited testimony.

29

In the past, Hahn assisted with technical questions to help make a Rite-Hite sale. However, Hahn does not remember the names of the customers from the times he assisted Rite-Hite personnel, and he has never been directly responsible for a dock leveler sale. Hahn remembers Fortune 500 company employees that reported problems with Rite-Hite products.

Hahn has no design patents and has not ever testified in a design patent litigation. Hahn was not aware of any design patents in the dock leveler industry, even those design patents Rite-Hite owns. Hahn did not indicate he has any legal training regarding design patents. Hahn does not place much value in United States design patents. He does not consider them infringed unless the accused product is a "carbon copy" or contains "99%" of the patented design. (Ex. AL ( Hahn Dep.) 18:11 & 18:22.) (ECF No. 81-6.) Like Systems' head of engineering, Hahn believes a variety of recently issued United States design patents lack ornamentation (are entirely dictated by function) and/or have little to no value. Rite-Hite designs the visible portions of all its dock levelers to look aesthetically pleasing.

Mike Pilgrim ("Pilgrim"), an officer and owner of Systems, and former employee of Rite-Hite is a long-time friend of Hahn. Pilgrim called Hahn to get his opinion on Nordock's subject '754 patent and Systems' accused levelers. Hahn "did a favor for a friend" by giving Pilgrim his "knee-jerk" or "gut-shot" response. (Ex. AL, 51:10, 94:22 to 95:5.) Hahn told Pilgrim that he did not want to be a witness in this case. Although Systems' September 2011 initial disclosures list him as a witness, Hahn did not agree to be a witness and

was surprised when he received a July 2012 subpoena to testify in this case. Hahn understands his testimony may help his friend, Pilgrim.

Hahn emailed Pilgrim a Hafa or Combursa "drawing" that Hahn obtained in 2011 from someone in Europe. (Ex. AL, 95.) Hahn does not have firsthand knowledge of the Crawford Door N.V. ("Crawford") brochure that Systems produced. The Crawford brochure[7] is written in "Dutch or something." (Ex. AL, 220.) Rite-Hite's European headquarters was near Amsterdam. Systems has not produced an English translation of the Crawford brochure.

Systems has not established a publication date for the asserted Crawford brochure. McGuire could not read the brochure and did not see a date on it. Pilgrim could not establish a publication date. Hahn agreed that there is no way to determine when the Crawford brochure was produced, and that it could have been after 2003 or after 2005. Systems' expert said that he does not know if the Crawford or Combursa brochure is prior art because he could not establish a publication date.

Hahn states he saw a Hafa leveler with a header plate and lugs at the Hannover Fair trade show in Germany sometime in the late 1980s to mid-1990's. Hahn told Pilgrim that the leveler looked "sort of like his leveler, as best as [Hahn] could remember." (Ex. AL, 193.) Hahn did not discuss the details of this leveler's front end design with Pilgrim. Although Hahn attended this trade show on behalf of Rite-Hite, he does not have a Hafa brochure showing the leveler, even though it was business practice to bring them back.

---

[7]The Crawford brochure is also referred to as Systems' deposition exhibit 29, Brookman deposition exhibit 6, and Hahn deposition exhibit 7.

Hahn did not pay attention to the details of the Hafa leveler when he saw it at the Hannover Fair and does not have detailed memories of what he saw. His lack of attention to detail and vague memory also applied for the Combursa leveler. Hahn stated: "I don't remember what they looked like" and "I did not investigate those kind of details [lip length and shape, lug width and thickness] because it didn't matter to me how they built their hinge."[8] He also said he only "roughly" remembered what the actual perspective view of the Hafa design looked like. (Ex AL, 97, 119-120, 237:21-23.) Hahn would not consider the perspective view of the '754 patent. He only considered the side view of the lugs of the '754 design patent because that is all he remembers.

> Question: And I asked you to draw a picture of the perspective view and your answer is?
>
> Hahn: I don't see any reason to do that. I gave you a [side] picture view of what I remember on the hinge, and that's as good as it's going to get. Because no matter how many pictures I draw you, I'm not going to remember any better.

(Ex. AL, 125.)

Hahn does not know the level of accuracy or attention to detail used to render the diagram shown in the undated Crawford brochure. Hahn does not remember bringing any specific brochure back from the Hannover Fair trade show, and does not remember if the Hafa leveler he saw with a header and lugs was in a brochure at the Hannover trade show. He has no recollection of bringing back a brochure with a picture showing the Hafa leveler with a

---

[8]This sentence and the following sentence are based on paragraph 83 of Nordock's proposed findings of fact. However, they have been modified to correctly reflect the portions of the cited testimony.

header and lugs.  (Ex. AL, Hahn Dep. Tr. 220:2 to 222:13 and Ex. AC, Hahn Dep. Ex. 7.) Hahn has nothing to corroborate that he saw the asserted Hafa leveler in the late 1980's to mid-1990's, or what the front end of that leveler looked like when he saw it.  He has no document, and he knows of no other person who can corroborate his statement.

Hahn has never seen a Hafa or Crawford leveler with a header and lugs in the United States.  He said lug style levelers such as the Hafa leveler are for lower capacities are better suited for Europe where truck loading equipment is smaller and less heavy.

Hahn does not know if the Hafa design he saw in the late 1980's to mid 1990's was changed between the date he saw it and the undated Crawford brochure.  Hahn said the Crawford company did not make a dock leveler until it bought Hafa, but he did not know when the purchase occurred.  Public documents state the 1998 Crawford–Hafa merger "allowed the creation of a new generation of harmonized dock levellers [sic]." (Ex. AQ, Bates Nos. NOR 01806-1810.)  (ECF No. 83-2.)

Hahn does not recall a dock leveler with a header and lugs in the United States prior to 2003.  Hahn brought up a Beacon leveler he may have seen many years ago, but he could not remember what it looked like or if it had lugs.

### Impact of '409 Specification on the '754 Patent's Validity

During Gleason's deposition, Systems' counsel referenced the specification of Nordock's '409 patent, (Col. 2, Lines 51-67 and Col. 4, Lines 26-32), referring to the advantage of using the header to structurally support the front edge of the deck.  Gleason,

33

Ward, William R. Weber ("Weber"), president and owner of the Weber Company, Inc., in Chesterfield, Ohio, and James Flatley ("Flatley")[9] of the Flatley Company, Inc., in Richfield, Wisconsin, are of the view that this structure forms only a minor visual feature relative to the overall appearance of Nordock's front end design.  (Ex. AI, Gleason, Ward, Weber and Flatley Declarations, ¶¶ 10-12, 14-15.) (ECF No. 81-1.)

The above portion of the specification of the '409 patent pertains to the following structural limitation in Claim 36: ". . . said upper edge of said header plate being flushly aligned with and rigidly secured to said lower surface of said dock proximal its said outer longitudinal end, . . ."  (Ex. Q, Bates No.  NOR 00152.)

Brookman, one of Systems' named experts, asserts that a difference between the '754 patent and Systems' accused levelers is that the top edge of its header abuts the outer end (not the lower surface) of its deck.  (Ex. AG (Brookman July 20, 2012) Rebuttal, 14-16.) (ECF No. 64-19.)   Brookman agrees that PTO examiners are presumed to have done their job correctly.  He also agrees that the examiner may have read the first sentence of the '137 application for the '754 patent which lists each of its parent patents and applications.

The examiner's October 31, 2007, Office Action does not assert a lack of ornamentation refusal based on statements in the specification of Nordock's related patents and applications.   The "deck" of the dock leveler is shown in dotted lines in the '754 patent.

---

[9]Weber has over 40 years of experience as a distributor of dock levelers in the United States and Flatley has 20 years of experience as a distributor of dock levelers in this country.

Thus, its structural engagement with the top of the header plate is not a part of the claimed overall appearance of Nordock's front end lip, lug, and header plate design.

## Marketing

Gleason, Ward, Weber, and Flatley state although leveler brochures sometimes include text regarding the attractive appearance of the leveler, the brochures of the companies for which each of them have worked typically avoid text regarding the attractive appearance of the leveler because this can be perceived as detracting from the quality, strength or safety. This is certainly so with Nordock brochures. Nordock designs its levelers to have an appealing appearance, and spends marketing dollars to emphasize that appearance by including large pictures of its levelers in Nordock's brochures and marketing materials. A picture is worth a thousand words. Still, the textual content of Nordock's marketing typically emphasizes the quality, strength and safety of its levelers.

Gleason, Ward, Weber, and Flatley state Nordock levelers with its front end "lip, lug and header plate style" design are not the only leveler designs asserted to achieve a self cleaning lip hinge. They state that the marketing statement in Nordock's brochures that reads "Exclusive Self Cleaning Lip Lug and Header Plate Design," emphasizes the exclusivity of Nordock's "lip, lug and header plate style" design, not that this design is the only way to achieve a self cleaning hinge.

Gleason, Ward, Weber, and Flatley also state that Nordock levelers with its front end "lip, lug and header plate style" design are not the only leveler designs asserted to achieve

35

strength, particularly for a stated rated capacity. Nordock's marketing statement in its brochure that reads "Exclusive Lip Lug and Header Plate Design Ensures Maximum Strength" emphasizes that the design achieves its rated capacity, not that its "lip, lug and header plate style" design is superior by its very nature. More metal can be put into most any front end design to improve the capacity of the design. Like most every manufacturer in the industry, Nordock's marketing literature includes advertising that emphasizes and promotes the strength of its levelers.

## Design Patent Infringement

Dock leveler manufacturers understand the significance of the appearance of a leveler to their customers, particularly the front end of the leveler. Gleason, Ward, Weber, and Flatley believe this is why the cover pages of most leveler brochures include large pictures of the leveler with the front end facing forward. Gleason, Ward, Weber, and Flatley state that the appearance of Nordock's front end "lip, lug and header plate style" design distinguishes Nordock and its levelers from those of other manufacturers. The visual appearance of the front end of a dock leveler is very important in making a dock leveler sale.

Gleason, Ward, Weber, and Flatley state that a high degree of visual similarity exists between the overall appearance of the front end design claimed by Nordock's '754 patent and the front end of each of Systems' accused levelers. They state that this is particularly so when taking into consideration the many alternate dock leveler front end

36

designs in the relevant prior art for the '754 patent. The high degree of visual similarity in overall appearance is particularly striking for Systems' six foot wide accused levelers.

Gleason, Ward, Weber, and Flatley state that there are only minor visual differences between the '754 patent and the front end of Systems' accused dock levelers. These differences are particularly minor in nature when taking into consideration the significant visual differences between the '754 patent and the many alternate dock leveler front end designs in the relevant prior art.

Gleason, Ward, Weber and Flatley state that ordinary observers of dock levelers (i.e., distributors and end users) look at the overall appearance of the front end "lip, lug and header plate" design when they make purchasing decisions. These four men also state that ordinary observers of dock levelers do not typically notice slight structural variations in a front end "lip, lug and header plate" design that have little visual impact on the leveler's overall appearance when they make purchasing decisions. They also state that even if an ordinary observer of a dock leveler noticed slight structural variations in the front end "lip, lug and header plate" design, that ordinary observer would still look to the overall appearance of the front end "lip, lug and header plate" design when making a purchasing decision. They also state that ordinary observers of dock levelers generally like the overall appearance of Nordock's front end "lip, lug and header plate" design.

They further state that ordinary observers of dock levelers do not typically count the number of lug sets in the front end "lip, lug and header plate" design when they make

37

purchasing decisions, and that even if an ordinary observer were to do so, that ordinary observer would consider a difference of one lug set to be a minor difference, and that ordinary observer would still look to the overall appearance of the front end "lip, lug and header plate" design when making a purchasing decision. In a similar vein, Gleason, Ward, Weber and Flatley state that ordinary observers do not typically notice whether or not the lower corners of the header are chamfered when they make purchasing decisions, and that even if an ordinary observer was to notice whether or not the lower corners of the header are chamfered, that ordinary observer would still look to the overall appearance of the front end "lip, lug and header plate" design when making a purchasing decision.

Furthermore, they state that ordinary observers of dock levelers do not typically notice if a couple of outer lug sets are not uniformly spaced when the majority are uniformly spaced when making purchasing decisions. And, even if an ordinary observer noticed that the outer lug sets are not uniformly spaced when the majority are uniformly spaced, that ordinary observer would still look to the overall appearance of the front end "lip, lug and header plate" design when making a purchasing decision.

The July 22, 2010, letter from Attorney Phillip P. Mann ("Mann"), Systems' outside counsel, to Systems was written five years after Systems learned of Nordock's '409 patent containing Figures 10A through 10G, and 14 months after Nordock's May 19, 2009, letter to Systems. However, Mann does not discuss the various alternate dock leveler front end designs prior to making the following statements:

38

> Given that most if not all of what is shown in the drawings [of the '754 patent] is functional, not ornamental, I am hard-pressed to ascertain what Nordock might consider "ornamental" in what is shown. . . . Again, given the fact that the appearance of dock levelers is almost entirely dictated by function considerations, it is difficult even to determine what aspects of Nordock's claimed design are "ornamental" in the first place.

(Ex. AAD.) (ECF No. 83-15.)

Mann's July 22, 2010, letter does not discuss the "overall appearance" of the front end design shown in the '754 patent relative to the "overall appearance" of the front end of Systems' accused levelers. The letter also does not identify who is an appropriate "ordinary observer" (i.e., not himself), and does not discuss what an ordinary observer considers when making a purchasing decision, prior to making the following statement:

> Given these readily apparent, substantial differences between the appearance of the Systems product against what is shown in the figures of the Nordock design patent, there is little, if any likelihood that a reasonable observer would mistake one product for the other and that such mistake would be caused by any common use of "ornamental" (as opposed to functional) features in the two products.

(Ex. AAD.)

### Trade Dress Infringement and Unfair Competition

Nordock and Systems sell the identical type of goods; i.e., dock levelers. Nordock and Systems are competitors, and sell dock levelers in identical channels of trade. Nordock and Systems display their dock levelers at the same trade shows and advertise in the

39

same trade journals. The two companies also sell dock levelers to identical types of customers — distributors, many of which purchase the levelers prior to reselling them to end users.

Nordock began selling dock levelers with its front end lip, lug and header plate design in the United States in March 2002. Nordock spent substantial funds marketing its front end design for its levelers. Its officers personally visited prospective distributors throughout the United States. Nordock published downloadable brochures, displayed levelers at trade shows, and advertised in trade journals. Through these efforts, Nordock sold a large quantity of levelers throughout the United States prior to Systems' first sale of its accused dock levelers.

Gleason, Ward, Weber, and Flatley believe that there is a high degree of similarity between the marks (i.e.; product configuration trade dress) and that the overall appearance of the front ends of Nordock's and Systems' dock levelers is highly similar, if not virtually identical. The overall appearance of the front end design of a dock leveler plays a major role in customer purchasing decisions. The front end design is prominently displayed in manufacturer brochures and internet advertising. The front end design is prominently displayed at about eye level at trade shows.

Before 2002, there is no evidence of a dock leveler sold in the United States having a front end with a header and deck lugs to pivotally secure the lip to the deck. Nordock began selling dock levelers with its distinctive front end lip, lug and header plate design in the United States in March 2002. Gleason, Ward, Weber, and Flatley state that in the minds of

40

dock leveler consumers (e.g., distributors and end users) the primary significance of the front end design of Nordock's levelers is to identify the source of the leveler as being from Nordock. This primary significance occurred in the minds of consumers prior to Systems' first sale of its accused levelers in October 2005.

Gleason, Ward, Weber and Flatley state that given the distinctiveness of Nordock's front end design relative to the front end designs of other commercially sold third party levelers, the degree of similarity between the front end designs of Nordock and Systems levelers, and the degree of care of dock leveler consumers, a likelihood of confusion exists between the Nordock and Systems levelers, particularly in that consumers will likely mistakenly believe that either Nordock has authorized Systems to use its distinctive front end design, or that Systems' accused levelers having a similar front end design are associated with or sponsored by Nordock. Gleason, Ward, Weber and Flatley also state that given the variety of dock levelers sold in the U.S., Nordock's front end design cannot be considered one of a few superior designs. Competitors do not need Nordock's distinctive front end design to effectively compete in the dock leveler industry. These four men also state that Systems' use of Nordock's distinctive front end "lip, lug and header plate" design on less expensive dock levelers leads consumers and ordinary observers to believe that Nordock's distinctive front end design is inferior in quality and strength to the front end designs of Nordock competitors. While an average Systems mechanical leveler sells for over $1,800.00, and the average Systems hydraulic leveler sells for over $2,500.00, Systems' expert indicates that Systems

41

expected to save less than $5.00 per leveler by switching to its accused levelers. Systems has not produced financial information that would allow Nordock to substantiate the savings that Systems claims

## Validity of the Patent

Section § 282 of Title 35 of the United States Code mandates that all patents be presumed valid; the burden of establishing invalidity by clear and convincing evidence rests with the challenging party. *See Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1377 (Fed. Cir. 2002). Section 171 of Title 35 provides the criteria for obtaining a design patent. It provides that: "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 171. In other words, design patents may be challenged for the same reasons that other patents may be challenged. *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1238 (Fed. Cir. 2009).

## Anticipation

Section 102(a) of Title 35 of the United States Code states "[a] person shall be entitled to a patent unless — (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent. "Whether an asserted anticipatory document qualifies as a 'printed publication' under § 102 is a legal conclusion based on underlying factual

42

determinations." *Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002).

The key inquiry of whether a reference constitutes a "printed publication" is whether the reference has been made "sufficiently accessible to the public interested in the art." *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004) (citation omitted). "A reference is publicly accessible upon 'a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (internal quotations and citations omitted).

The ordinary observer test is the sole test for anticipation. *Int'l Seaway Trading Corp.*, 589 F.3d at 1240. "That which infringes, if later, would anticipate, if earlier." *Id.* at 1239 (quoting *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)). "The presumption of validity . . . requires those challenging validity to introduce clear and convincing evidence on all issues relating to the status of a particular reference as prior art." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed.Cir. 2001).

43

With respect to anticipation, Systems relies on the Crawford reference.[10] (Whittaker Decl. Support Def.'s Mot. Summ. J., Ex. 5.) (ECF No. 66-5.) Nordock opposes reliance on the reference on the grounds that the reference was not previously disclosed.

Regardless of any potential merit, there is no need to tarry with Nordock's non-disclosure argument. Systems has not established a publication date for the Crawford brochure. No witness was able to provide a date for the Crawford brochure. While Hahn testified that Crawford did not make a dock leveler until sometime after acquiring Hafa, and the record establishes that the merger occurred in 1998, Hahn lacks any first-hand knowledge of the Crawford brochure, and agreed that the brochure could post-date 2003 or 2005.

Moreover, while Hahn recalls seeing a Hafa leveler with a header plate and lugs at the Hannover Fair trade show, he does not know whether there was a brochure for that leveler. Hahn has no document showing the Hafa dock leveler and knows of no other person who can corroborate his statement. *See Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1986) ("Although in some circumstances unsupported oral testimony can be sufficient to prove prior knowledge or use, it must be regarded with suspicion and subjected to close scrutiny.").

---

[10]Systems' reply brief in support of its summary judgment motion asserts that "as set forth in Systems' principal brief it is the Crawford reference and the Combursa reference as set forth below that are adequate both as printed publications and as proof that the designs were in widespread use in Europe." (Reply Systems' Mot. Summ. J., 5.) (ECF No. 91.) However, Systems' principal brief did not address the Combursa reference, only the Crawford reference. (ECF No. 65.) Furthermore, page 6 of Systems' reply brief states that the Combursa reference is dated July 23, 2000. That date has not been presented by Systems as a proposed finding of fact and has not been established.

44

Despite considering the undisputed facts regarding Hahn's report of his observations at the Hannover trade show in the light most favorable to Systems, the record regarding the undated reference does not provide sufficient facts for a reasonable jury to conclude that the Crawford reference existed prior to November 2001. Since Systems has not presented sufficient evidence upon which a reasonable jury could find that the Crawford reference was a printed publication that anticipated the '754 patent, Nordock will be granted summary judgment on the issue of anticipation.

### Obviousness

Design patents are subject to the nonobviousness requirement of 35 U.S.C. § 103. *See* 35 U.S.C. § 171. "The ultimate inquiry . . . is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Apple, Inc. v. Samsung Elec. Co., Ltd.,* 678 F.3d 1314, 1329 (Fed. Cir. 2012) (quoting *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1380-81 (Fed. Cir. 2009) (quoting *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996))). *Apple, Inc.,* 678 F.3d at 1329, explains that to determine "whether 'one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design,'" the finder of fact must employ a two-step process. First, "one must find a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" *Id.* Second, other "secondary" references "may be used to modify [it] to create a design that has the same overall visual appearance as the claimed design." *Id.*

45

Further, these secondary references must be "so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Id.* at 1330.

Nordock maintains that Systems has not identified a primary reference and, thus, fails on its obviousness argument. It also states that Systems fails to meet its burden of establishing obviousness by clear and convincing evidence. Systems asserts that the '754 patent was obvious in light of the Crawford dock leveler NHM/NHH, Bates-stamped number SI200927; the Kelley Company's United States Patent Nos. 6,216,303 (the "'303 patent") and 4,068,338 (the "'338 patent") tear drop designs; Overhead Door's United States Patent No. 3,835,497(the "'497 patent"); and the '719 patent.

Systems maintains that it previously identified the Crawford reference in its response to Nordock Interrogatory No. 15 which requested identification of System's primary prior art reference of its assertion that the '754 patent is invalid. (System's Opp'n Nordock Summ. J., 8-9.) However, Systems responded:

> See Systems Inc. Production Documents Nos. SI100800-940, as well as all references cited on the face of the design patent in suit and in its file history. Systems, Inc. reserves the right to supplement its answer to this interrogatory during disclosure of expert reports and related expert discovery.

(Supplement to Ex. AB)(ECF No. 94.) The Crawford brochure that Systems relies upon falls within the 200800-940 series of its documents; not the 100800-940 series of its documents. Either Systems is mistaken or it has been caught in a sleight of hand.

46

*Titan Tire Corp.*, 566 F.3d at 1380-81, provides authority for the Court to consider any of the identified references as a primary reference, despite Systems' failure to identify a primary reference. The problem with the Crawford brochure is that Systems has not presented sufficient evidence to establish a date for the brochure. Thus, it will not be considered as prior art.

Each patent cited by Systems as prior art is listed as prior art in the '754 patent. Systems asserts that the '719 patent shows every element of the design shown in the figures of the '754 patent. Systems also cites pages 15 through 20 and exhibit B attached to Brookman report. (ECF No. 67). However, the cited pages discuss functionality, not obviousness. Exhibit B, described on page 15 of the Brookman report, as "includ[ing] information and figures from a selected portion of the prior art cited against the ['754] [p]atent," is not attached to the report.[11]

The March 23, 2007, non-final decision of the patent examiner on the '941 application found that the '719 patent disclosed a "dock leveler having a deck assembly (30) supported by beams (32), a header plate (74) with lugs (75) and a lip plate (56) with lugs (57)." (Whitaker Decl. filed Sept. 20, 2012, Ex. A-3 (Prosecution History, Detailed Action) 2.) (ECF No. 66-3.) The examiner also found that the single rod would have been obvious to one of ordinary skill in the art at the time of the invention. (*Id*., Ex. A-3 (Detailed Action), 3.)

---

[11]The exhibits attached to the Brookman report are listed on the docket as B-1 and B-2. However, they are marked as exhibit A, and do not match Brookman's description of exhibit B.

However, the examiner was considering the '941 application from the functional perspective of a utility patent, not the ornamental perspective of a design patent.

Figures 5 through 11 of the '719 patent show a dock leveler with a unique front end design with a header plate and uniformly spaced lugs that outnumber the deck beams, and either a J-shaped plate in lieu of lip lugs (figures 5 through 8) or lip lugs with a full width gusset (figures 9 through 11). While the '719 patent has the functional elements, its figures do not show design characteristics which are basically the same as the claimed design. *See Apple, Inc.*, 678 F.3d at 1329. Therefore, '719 patent can not serve as a primary reference.

Systems states that the design shown in the '754 patent is nothing more than a combination of the teardrop lug hinge shown in the '303 and '338 patents with the header plate of the '497 patent. (Br. Systems Mot. Summ. J., 14.) Systems states that the '303 patent "discloses at least the identical teardrop design as that illustrated in the figures of the '754 patent." (*Id*. at 12.) However, the '303 patent discloses lip lugs and deck lugs — neither of which is a tear drop. The lip lugs are corn-kernel shaped with a blunt end that faces outward. The deck lugs (the lugs attached to the inside of the deck) are wider and longer than the lip lugs and have a wider blunt end that faces downward. The deck lugs are also nipped beneath the hinge pin. There is no header plate. The lip and deck lugs are paired. There are fourteen pairs with twelve pairs grouped in six sets of two on opposite sides of the deck beam, with the deck beam visible. The remaining two pairs are at the hinge pin ends.

48

The '338 patent shows a lug which Systems states also discloses at least the same nearly identical tear drop shaped lug hinge design. The '338 lip lug does resemble that of the '754 patent, and there is a lip. However, the lip lugs are paired with a gusset — not a lug. There are 14 lug-gusset pairs grouped in six sets of two on opposite sides of the header beam. The remaining two sets are at the hinge pin ends. There is no header plate.

Systems also relies on the header plate of the '497 patent — stating that there are almost no visible differences between the '497 header plate and the '754 header plate. However, the proportions of the lip plate to the header plate are not similar to those of the '754 patent. It also lacks lugs. Systems' argument regarding the '303, '338 and '497 patents does not provide a primary reference as required. *See Apple, Inc.*, 678 F.3d at 1329. Despite construing the evidence in the light most favorable to Systems, it has not presented sufficient evidence upon which a reasonable jury would find that the '754 patent was obvious. Therefore, Nordock will be granted summary judgment on the issue of obviousness.

### Functionality

Nordock contends that its design is primarily ornamental and is not dictated by function. Systems contends that all evidence points to the conclusion that the '754 patent is invalid as purely functional.

A design patent cannot secure protection for functional elements. *See Richardson v. Stanley Works, Inc.,* 597 F.3d 1288, 1293 (Fed. Cir. 2010). The purpose of a claim construction hearing for a design patent is to filter out the functional aspects of the

49

design patent. *Id.* An aspect of a design patent is non-ornamental only if the design is dictated by its functionality ("de jure functional") and there are not alternative designs that could perform the same function. *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123 (Fed. Cir. 1993); *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed. Cir. 1997). Stated somewhat differently, functional design elements can be claimed, however, when they serve a primarily ornamental purpose, e.g., in circumstances where there are several ways to achieve the underlying function. *L.A. Gear, Inc.*, 988 F.2d at 1123. Resolving "[w]hether a patented design is functional or ornamental is a question of fact." *PHG Techs., LLC v. St. John Cos.*, 469 F.3d 1361, 1365 (Fed. Cir. 2006).

Factors to consider when determining whether the claimed design is dictated by the use or purpose of the article include: (1) "whether the advertising touts particular features of the design as having specific utility;" (2) "[t]he presence of alternative designs" and "whether [those] designs would adversely affect the utility of the specified article;" (3) "whether there are any elements in the design or an overall appearance clearly not dictated by function;" (4) "whether there are any concomitant utility patents;" and (5) "whether the protected design represents the best design." *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997); *see also*, *PHG Techs., LLC*, 469 F.3d at 1366-67.

### Advertising

Nordock's advertising touts the functional qualities of its lip, lug and header plate design. The advertising highlights its "self cleaning" lip lug and header plate design.

50

It also states that its lip, lug and header plate design ensures "maximum strength." While these types of advertising may not be unique in the dock leveler industry, Nordock is marketing its lip, lug and header plate as a whole and as serving a function.

### Alternative Designs

The materials before the Court establish that there is a great variation in dock leveler design. *See infra* at 21-22.

### Elements in the Design Not Dictated by Function

The reports of Visser and Brookman demonstrate that there is a genuine dispute of material fact regarding whether many elements in the design are non-functional. However, even Brookman concedes that the corners of the header plate are non-functional.

### Utility Patents

The '409 and the '591 patents are utility patents that originated from the '279 application filed by Gleason on December 23, 2009.

### Best Design

Nordock touts its design as the best design for dock leveler. However, Nordock's design is not the only way to do things. The determination of functionality is a factual determination which must await trial.

### Prosecution History Estoppel

Nordock asserts that Systems presents no evidence to support a genuine issue regarding prosecution history estoppel for the '754 patent. Systems maintains that Nordock

argued during the prosecution of the parent application to the '754 patent that all of the elements which appear in the drawings of the '754 patent are functional; that those elements are better than any other way of doing it.

Systems cites the following examples as being illustrative of Nordock's arguments. Nordock stated: "[The] header plate is combined with a lip plate lug type hinges [sic] to reduce the concentrated stresses on the tubular [sic] hinge to provide a longer structural life for the dock leveler." ('409 patent 4:26-32) (emphasis added). Nordock also stated "[t]he connection [of the lip plate to the deck frame by the hinge] is a critical part of the leveler as it must withstand concentrated stresses as the fork lift and the load it is carrying traverse from the building to the trailer, or visa versa." (*Id*. at 2:51-56) Nordock also stated that its invention had "[a] durable combined lip lug and header plate hinge construction." (*Id*. at 3:15-16.)

Nordock also pointed out that "a [prior art dock leveler] design uses lip plate lugs to lessen these stresses. In lieu of a header plate, cooperating lugs are also welded to the support beams and deck plate. A problem with this design is that the unsupported front edge of the deck plate is more easily bent and dished between the support beams." (*Id*. at 2:60-65.)

The facts regarding the prosecution history are not disputed. However, the parties' interpretation of the legal import of those facts differ. Systems' argument is unacceptable because, if adopted, it would make it difficult for any patentee who has sought or obtained a utility patent to subsequently obtain a valid design patent. Systems has not cited

52

any case law to support its position that arguments made in support of function foreclose a design patent. Therefore, Nordock is granted summary judgment on the issue of prosecution estoppel.

## Laches

Nordock maintains that Systems presents no evidence to support a genuine issue regarding its defense of laches. "[L]aches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992). To succeed in a defense of laches, Systems must prove the following two factors:

> 1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and,
>
> 2. the delay operated to the prejudice or injury of the defendant.

*Id.* at 1032. The period of delay "does not begin prior to issuance of the patent." *Id.* Laches bars the recovery of pre-filing damages. *See id.* at 1041. Material prejudice to adverse parties resulting from the plaintiff's delay is essential to the laches defense. *Id.* at 1033. Such prejudice may be either economic or evidentiary. *Id.* The preponderance of the evidence standard applies to establishing the facts relating the laches. *Id.* at 1045.

Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented

53

by earlier suit.  *Id*.  at 1033.  Such damages or monetary losses are not merely those attributable to a finding of liability for infringement.  *Id*.  Otherwise, economic prejudice would arise in every patent infringement action.  *See id.*

Systems asserts that it was improper for Nordock to essentially sit by idly after threatening infringement merely so that it could increase any possible damages award from six months to two and a half years worth.  (System's Opp'n to Nordock Mot. Partial Summ. J., 12.) (ECF No. 82.)  Nordock has established that on May 19, 2009, it advised Systems of its '754 Patent, and that Systems' subject leveler infringed the '754 patent.  On July 13, 2009, Systems' counsel responded by asserting that the '754 patent is invalid.  After this exchange of letters, Nordock continued to correspond with Systems until March 10, 2010.  The action was filed on January 28, 2012.  In citing the two and a half-year period, it is unclear the date from which Systems is calculating.  Additionally, Systems' claim of prejudice is based on the increased amount of Nordock's damages as a result of the delay.  Economic damages of the sort claimed by Systems, are insufficient to establish the laches defense.  Therefore, Nordock's request for summary judgment on the laches defense is granted.

### Equitable Estoppel

Nordock seeks summary judgment contending that Systems presents no evidence to support a genuine issue regarding equitable estoppel.  The defense of equitable estoppel requires the defendant to show:

> a. The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to

54

enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.

b. The alleged infringer relies on that conduct.

c. Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*A.C. Aukerman Co.*, 960 F. 2d at 1028. To show reliance, the accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action. *Id*. at 1042-43. In *Ackerman*, the federal circuit cited the following example to illustrate reliance:

An infringer can build a plant being entirely unaware of the patent. As a result of infringement, the infringer may be unable to use the facility. Although harmed, the infringer could not show reliance on the patentee's conduct. To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with building the plant.

*Id*. at 1043. The material prejudice required may be "a change of economic position" or "loss of evidence." *Id*. The preponderance of the evidence standard applies to establishing the equitable estoppel factors, absent special circumstances, such as fraud or intentional misconduct. *Id.* at 1046.

Systems has not addressed the reliance or the material prejudice elements of its equitable estoppel defense. Despite construing the facts in the light most favorable to Systems, there is an insufficient basis for any component of the equitable estoppel defense. Therefore, Nordock is granted summary judgment dismissing System's equitable estoppel defense.

55

## Unclean Hands

Nordock states that Systems presents no evidence to support a genuine issue regarding unclean hands.[12] The defense of unclean hands is based on the equitable maxim that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maintenance Mach. Co.,* 324 U.S. 806, 814 (1945). "The maxim is . . . a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.*

Systems asserts that its unclean hands defense is based on Nordock's unjustly seeking to secure utility patent protection with a design patent after Nordock was unable to obtain utility patent protection. Systems contends that Nordock is asserting its '754 patent against industry competitors who have come to rely on Nordock's failure to secure actual utility patent protection for that design.

Unclean hands is an equitable defense within the sound discretion of the district court. *Princess Cruises, Inc. v. United States,* 397 F.3d 1358, 1369 (Fed. Cir. 2005) ("The trial court has broad discretion under the doctrine of unclean hands.") Bearing in mind the discretion inherent in deciding whether to apply the clean hands doctrine, this Court concludes that the facts of this case do not warrant its application. Having failed to obtain a utility

---

[12]Nordock incorrectly cites *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-92 (Fed. Cir. 2011) in support of the elements of unclean hands. *Therasense* addresses the inequitable conduct defense. While that defense evolved from the unclean hands doctrine, it is a distinct doctrine with different factors to be considered.

56

patent on claims 36 through 41, Nordock submitted the '137 application and, subsequently, obtained the '754 patent. Nordock did what the law permits. Despite construing the facts before the Court in the light most favorable to Systems, there is no basis for concluding that Nordock is tainted with inequitableness or bad faith. Consequently, Nordock is granted summary judgment as to the unclean hands defense.

## Infringement

"Design patent infringement is a question of fact, which a patentee must prove by a preponderance of the evidence." *Richardson*, 597 F.3d at 1295. The "ordinary observer" test should be the sole test for determining whether a design patent has been infringed. *Egyptian Goddess,* 543 F.3d at 678. Under that test, infringement will not be found unless the accused article "embod[ies] the patented design or any colorable imitation thereof." *Id*. (quoting *Goodyear Tire & Rubber Co.*, 162 F.3d at 1116-17; and citing *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed. Cir. 2007)).

The Court of Appeals for the Federal Circuit posed a two-phased approach to this inquiry:

> In some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear "substantially the same" to the ordinary observer, as required by *Gorham* [*Mfg. Co. v. White*, 81 U.S. 511 (1871).] In other instances, when the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art.

57

*Id.* "Where there are many examples of similar prior art designs . . . differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Id.* The ordinary observer test similarly applies in cases where the patented design incorporates numerous functional elements. *Richardson*, 597 F.3d at 1295 (citing *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006) (holding that while it is proper to factor out the functional aspects of various design elements, that discounting of functional elements must not convert the overall infringement test to an element-by-element comparison). In evaluating infringement, the court determines whether "the deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation." *Id.* (citing *Amini Innovation*, 439 F.3d at 1371).

"[Patent] [i]nfringement . . . is a question of fact. However, summary judgment may be appropriate when there is no genuine issue of material fact or when, drawing all factual inferences in favor of the nonmoving party, no reasonable jury could return a verdict for the nonmoving party. *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) (internal citations and quotation marks omitted).

Despite construing the evidence in the light most favorable to Systems, the Court concludes that Nordock has presented evidence upon which a reasonable jury could find that Systems infringed on the '754 patent. Similarly, with respect to Systems' contention of non-infringement, construing the evidence in the light most favorable to Nordock, the Court

58

concludes that the issue must be resolved by a jury. On summary judgment, this Court may not weigh the evidence or make credibility determinations. Therefore, neither party is granted summary judgment on the infringement issue.

### Trade Dress

Systems seeks summary judgment dismissing Nordock's trade dress claims based on its assertion that Nordock cannot establish that (1) its dock levelers are protectable as trade dress, and (2) that there is a likelihood of confusion between the Systems dock levelers and the Nordock dock levelers. Nordock counters that it has submitted sufficient evidence regarding secondary meaning and likelihood of confusion to create material factual disputes for the finder of fact to resolve at trial. (ECF No. 80-1) In reply, Systems asserts that Nordock has not presented any admissible evidence, and its advertising undermines its secondary meaning position.

Trade dress "is essentially [the] total image and overall appearance" of a product, and "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992). A product's unregistered trade dress is protected from infringement. 15 U.S.C. § 1125(a); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 578-579 (7th Cir. 2005).

One asserting trade dress infringement must show that: (1) its trade dress is protectable because it is either inherently distinctive or has acquired secondary meaning and

59

(2) the similarity of the defendant's trade dress causes a likelihood of confusion as to the source or affiliation of the products. *See Thomas & Betts Corp.,* 138 F.3d at 291. "'[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). Factors such as direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying have been utilized by courts as a guide in determining whether or not a product should be accorded a secondary meaning. *See Thomas & Betts Corp.*, 138 F.3d at 291.

Additionally, a plaintiff must prove that an unregistered trade dress is "not functional." *See* 15 U.S.C. § 1125(a)(3). "'[A] product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex Co.*, 514 U.S. at 165).

### *Secondary Meaning*

*Advertising*—Nordock has presented evidence that it spent substantial funds marketing its front end design for dock levelers. Gleason and Ward also traveled throughout the United States personally visiting prospective distributors. Nordock also published downloadable brochures, displayed its dock levelers at trade shows and advertised in trade

journals.  The front end of Nordock's dock levelers are prominently displayed at trade shows and in its brochures.

*Consumer Surveys*—Nordock does not rely on consumer surveys.

*Length and Manner of Use*—Nordock sold a large quantity of levelers throughout the United States before October 2005, when Systems began selling its accused levelers.

Nordock has presented sufficient evidence to raise a genuine issue of material fact regarding secondary meaning.  *See Thomas & Betts Corp.,* 138 F.3d at 293-94.

### Likelihood of Confusion

A number of factors must be examined when determining if a likelihood of confusion exists between the trade dresses of two products.  "These include: 1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff."  *Id.* at 296 (citations omitted).  "[N]one of these factors considered alone is dispositive, and the weight to be accorded each varies from case to case."  *Id*. (citations omitted).  When making its inquiry, the court must compare the trade dresses  "'in light of what happens in the marketplace,' not merely by looking at the two . . . side-by-side."  *Id.* (citations omitted).

Nordock has presented evidence that the overall appearance of the front end design of a dock leveler plays a major role in customer purchasing decisions, and there is a

high degree of similarity between the marks (i.e., product configuration trade dress); the overall appearance of the front ends of Nordock's and Systems' dock levelers is highly similar, if not virtually identical. Nordock and Systems sell identical type of goods to identical types of customers in identical channels of trade at similar prices. Consumers are not likely to use sufficient care to avoid being confused.

Furthermore, Nordock has presented evidence that in the minds of dock leveler consumers (e.g., distributors and end users) the primary significance of the front end design of Nordock's levelers is to identify the source of the leveler as Nordock and that this primary significance occurred in the minds of consumers prior to Systems' first sale of its accused levelers in October 2005. Gleason, Ward, Weber, and Flatley also state that given the distinctiveness of Nordock's front end design relative to the front end designs of other commercially sold third party levelers, the degree of similarity between the front end designs of Nordock and Systems' levelers, and the degree of care of dock leveler consumers, a likelihood of confusion exists between Nordock and Systems levelers such that consumers will likely mistakenly believe that either Nordock has authorized Systems to use its front end design, or that Systems' accused levelers having a similar front end design are associated with, or approved by Nordock. Construed in the light most favorable to the non-movant, Nordock has presented sufficient facts from which a reasonable jury could find that there is a likelihood of confusion.

62

Systems challenges the evidence presented by Nordock under Rules 602, 701 and 702 of the Federal Rules of Evidence. Systems correctly contends that almost all of Nordock's evidence regarding secondary meaning is based on the affidavit testimony of its own employees or distributors. However, for purposes of summary judgment, the declarations of Gleason and Ward — employees of Nordock — and Weber and Flatley — Nordock distributors — provide sufficient foundation for each witness's averments, including the opinions they express. Each declaration states that it is based on the witness's personal knowledge and provides a short statement of the witness's background in the dock leveler industry. (Ex. A (Gleason Decl. ¶¶ 1-2, Ward Decl. ¶¶ 1-2, Weber Decl. ¶¶ 1-2, Flatly Decl. ¶¶ 1-2.) (*See* ECF No. 81-3.)

Systems also argues that Nordock's advertising statements about the quality of its dock levelers undermine its secondary meaning position. That is an argument that must be resolved by the jury. Construing the evidence in the light most favorable to Nordock, Systems has not established that Nordock lacks sufficient evidence upon which a reasonable jury could find that the likelihood of confusion exists. Therefore, with respect to Nordock's unfair trade practices claims, Systems has not established that Nordock's claims should be dismissed on summary judgment.

63

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Systems' Rule 7(h) expedited non-dispositive motion for an order directing Nordock to pay expert fees (ECF No. 113) is **GRANTED** to the extent that Nordock **MUST PAY** an additional **$1,700.00** to Bero **no later than March 4, 2013**, and **DENIED** in all other respects;

Nordock's motion to strike Brookman as expert witness on trade dress and unfair competition (ECF No. 52) **GRANTED** to the extent that the following portions of Brookman's report are struck: sections 1 (secondary meaning); 1.a. (long use of the mark) on pages seven and eight; 1.b. (advertising) on pages eight and nine, and the final sentence of the section on page 12; and 1.c. (consumer recognition) on page 12, and Brookman may not testify as to that content of his report; and **DENIED** in all other respects;

Nordock's motion to strike patent attorney Brookman as an expert as to the validity, claim construction and infringement of the '754 patent (ECF No. 111) is **DENIED**;

Nordock's motion for partial summary judgment as to the validity and enforceability of the '754 patent (ECF No. 59) is **GRANTED** as to the following defenses: anticipation; obviousness; prosecution estoppel; laches; equitable estoppel; and unclean hands; and is **DENIED** in all other respects; and

64

Systems' motion for summary judgment (ECF No. 65) is **DENIED**.

Dated at Milwaukee, Wisconsin this 26th day of February, 2013.

**BY THE COURT**

_____

**Hon. Rudolph T. Randa**
**U.S. District Judge**